## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**TRAVERSE CITY EQUITY**
**INVESTMENTS, LLC D/B/A**
**SPABATH COMPANY**
        Debtor

Case No. BT 20-03039
Chapter 11
Hon. James W. Boyd

_____/

## DECLARATION OF ARTHUR SILLS
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, ARTHUR SILLS, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the managing member of Traverse City Equity Investments, LLC d/b/a SpaBath Company (the "**Debtor**"), and I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtor to commence its Chapter 11 case and in support of (i) the Debtor's petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) the relief requested by the Debtor pursuant to various motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

2.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtor has authorized me to submit this Declaration on its behalf.

3.     Further, I have reviewed generally the First Day Motions and affirm that the facts set forth therein are true and correct to the best of my knowledge.

## BACKGROUND

**Corporate Structure.**

4.      Traverse City Equity Investments, LLC d/b/a SpaBath Company, a Michigan company (**"Debtor"**) conducts business for the express purpose of designing, developing, manufacturing and distributing a roll-door model bathing system for the residential marketplace.

5.      The Debtor is owned 100% by its sole member Arthur Sills (**"Art Sills"**).

**Business Operations.**

6.      The company has approximately 4 employees.

7.      The Debtor's headquarters are located at 2382 Cass Road, Traverse City, Michigan, 49684. Debtor leases the property from Premethiets, Inc., an unrelated third-party.

**Business History.**

8.      In 2009, I established The SpaBath Company, LLC ("SpaBath, LLC"), serving as its managing member, with the express purpose of designing, developing, manufacturing and distributing a roll-door model bathing system for the residential marketplace.

9.      I successfully obtained financing in 2012 from several sources: the Michigan Economic Development Fund, private investors, and, most importantly, a $740,000 loan from Huntington National Bank, which I enabled via a personal cash guarantee of $340,000 and individual liability for any balance due.

10.     In 2013, after more than three years of effort, I completed the first model of the SpaBath Roll-Door® model ("The SpaBath").

11.     I personally own the patent, intellectual property and trademarks with reference to the unique technology of the SpaBath Roll-Door® model.

12.    Having worked successfully with ArjoHuntleigh ("Arjo") in past businesses, I approached them to review and consider The SpaBath for the institutional market i.e. assisted living, nursing and hospital facilities. Including buying one my companies in 1997.

13.    After a successful demonstration of The SpaBath to Arjo executives in October 2013, negotiations began for an exclusive distribution agreement for the North American institutional market (the "Agreement"). Negotiation of terms and formation of the Agreement stretched out over eighteen months or so, primarily due to Arjo's continuous delays.

14.    Following a change in leadership, on October 6, 2017, Arjo submitted a demand letter for 182 units to be delivered within 90 days (the "10/6/17 Order").

15.    Having never purchased more than 8 units in any given month, and knowing the limits on SpaBath, LLC's production capacity, Arjo could not possibly have had a reasonable expectation that the 10/6/17 Order could be fulfilled.

16.    My unequivocal belief is that Arjo submitted the 10/6/17 Order with the express expectation that it would cause SpaBath, LLC to declare that it could not fulfill that request within the 90-day time period, and for the purpose of subsequently declaring SpaBath, LLC to be in breach of the Agreement, allowing for its termination.

17.    True to my beliefs, when I informed Arjo that SpaBath, LLC could not possibly fulfill the 10/6/17 Order within the 90-day period, Arjo alleged SpaBath, LLC was in breach of the Agreement and considered it terminated. Arjo further alleged that all sums already paid over to SpaBath, LLC were advances on units not yet provided. It was then, and remains now, my unequivocal position that this allegation is both factually untrue and completely contrary to the intent and understanding of the parties involved at the time those sums were paid over to SpaBath, LLC.

18.      During the events in which the Agreement fell apart, I spoke with several customers in the institutional marketplace. All stated that they liked The SpaBath, wished to continue purchasing units, but based upon past performance did not want to have anything to do with Arjo or any entity to which Arjo had been associated. In short, in the eyes of my most valuable customers, SpaBath, LLC was tainted as a result of the past partnership with Arjo.

19.      Based upon those declarations by large-scale customers, it became apparent to me that it was necessary to create a new entity, one with no past relationship with Arjo, in order to preserve SpaBath's reputation and carry on with the sales of the SpaBath. Therefore, facing foreclosure, and with confidence that Arjo (and not SpaBath, LLC) had violated the terms of the Agreement, I personally believed with the assistance of counsel that I personally purchased the bank loan from Huntington National Bank.

20.      In order to compile enough capital to purchase the bank loans, I sold my home in Florida and took a private equity loan on my home in Traverse City.

21.      I did not create TCEI, or transfer assets from SpaBath, LLC to TCEI, with any intent whatsoever to defraud, delay or otherwise hinder a current or potential creditor. Specifically, with reference to this case, based upon the clear failures by Arjo to abide by the Agreement's terms, I never believed they would become a creditor of SpaBath, LLC.

22.      Arjo initiated arbitration proceedings against SpaBath, LLC on or about February 2018.

23.      With no reasonable belief that Arjo would prove successful in the arbitration, after filing an answer, affirmative defenses, and a motion for summary disposition of all Arjo's claims, I declined from further involvement in the arbitration proceedings. Doing so would only have represented a further drain on my already depleted financial resources, caused by Arjo's breach of the Agreement as described above. This course of action was a mistake.

4

24.     Contrary to my expectations, and without my personal testimony, Arjo did prove successful in the arbitration, securing an award for more than 1.4 million dollars, which it subsequently converted into a court judgment.

25.     In deference to the Arbitrator, I believe he erred in his review of the major issue i.e. whether the pre-payments were for units or guaranteed payments for Minimum Performance Requirements. Arjo's log of purchase orders and payment history were meaningless without confirming documentation. Arjo never provided documentation to verify their claims. Without them, his review was incomplete and determination necessarily erroneous.

26.     I believe the Arbitrator further seriously erred as he accepted the Affidavit comments from the Arjo CFO who had only been with Arjo for a couple months without verifying and clarification of his comments and submittals.  I, on the other hand, can verify and prove my stance with numerous documents.

27.     Again, I did not effectuate that purchase, borne at great personal cost, with any expectation that Arjo would eventually become a creditor of SpaBath, LLC or, in turn, the purpose of hindering Arjo's collection efforts. All of my business experience, as well as my clear understanding of the Agreement and the circumstances surrounding its creation, made clear to me that Arjo had breached the Agreement and was not owed anything by either SpaBath, LLC or me personally.

**Debt Structure.**

28.     After reviewing the documents with Debtor's bankruptcy attorney, I may have an unsecured claim against TCEI. I have retained Steve Bylenga to represent me individually.

29.     The Debtors owes TCF, formerly Chemical Bank, approximately $210,000.00 for a line of credit. The $250,000.00 line of credit has $40,000.00 available. The creditor has an all

asset lien. Debtor has made timely interest only payments of approximately $1,740.00 per month. The interest rate is approximately 5.35%.

**Events Leading To Chapter 11 Filing.**

30.    Ongoing litigation with ARJO and Covid-19 have resulted in my attention being devoted to matters outside of work and a slowdown in the industry. However, Debtor has an exclusive purchase agreement for side-opening bathing systems. Debtor is adding Leisure Living in Grand Rapids and other general developers.

## FIRST DAY MOTIONS

31.    To minimize the adverse effects of the commencement of its chapter 11 case on its business and employees, the Debtor will file several First Day Motions with this Court.

32.    I have reviewed the First Day Motions and believe the facts set forth therein are true and correct to the best of my knowledge. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interest of the Debtor's estate, creditors, and other parties in interest.

A.    **Employee Wages Motion.**

33.    In the ordinary course of their businesses, the Debtor incurs payroll obligations to its employees (the "**Employees**"). The Debtor's employs approximately 4 full-time Employees. The Employees perform critical functions for day to day business operations. Payroll is made every Friday.

34.    The Debtor's records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular Employee will not exceed the sum of $13,650.00 allowable as a priority claim under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

B.      **Cash Collateral Motion.**

35.      Through the Cash Collateral Motion, the Debtor seeks Court approval to use cash in which the Secured Lenders (as defined in such motion) may assert a lien (the "**Cash Collateral**"). Such cash collateral consists primarily of cash on hand plus the normal income received from the Debtor's customers and through the collection of theater ticket sales.

36.      The Debtor has an immediate need for the use of Cash Collateral and will suffer irreparable harm if they are not allowed urgently to use Cash Collateral for, among other things, continuing their regular business operations in an orderly manner; maintaining business relationships with vendors, suppliers, and customers, providing for the payment of employees, and satisfying other working capital, timely payment of critical vendors who provide direct distribution of movies and operational needs--all of which are vital to preserving and having the opportunity to maintain the Debtor's going-concern value and, ultimately, effectuating a successful course for the benefit of all creditors and parties in interest.

37.      The Debtor intends to use cash collateral consistent with a proposed budget (the "Budget"), as attached. Such Budget covers the expenses necessary to meet the normal operations of the Debtor's businesses and to properly administer the Debtor's bankruptcy estates while in the protections of chapter 11.

38.      As may be set forth in more detail in the Cash Collateral Motion, Debtor is seeking the Lender's authorization to use Cash Collateral. Utilizing cash collateral will help to consider maintaining the Debtor's business operations, to continually replenish its accounts receivable, and thereby preserve and enhance the value of the Secured Lender's collateral.

C.      **Cash Management Motion.**

39.      As noted in the Cash Management Motion, the Debtor utilizes in the ordinary course of business a centralized cash management system (the "**Cash Management System**")

7

commonly used by comparably sized companies to collect, transfer, concentrate and disburse funds as needed throughout the Debtor's operations.

40.     In the Cash Management Motion, Debtor asks the Court (a) to authorize the Debtor to maintain its existing bank accounts, checks and business forms without being required to close such accounts and forms and re-open new ones, (b) to authorize the Debtor to continue using its centralized cash management system, and (c) to authorize the Debtor's banks to accept and rely upon Debtor's notices and instructions as to which pre-petition checks can be honored pursuant to any order(s) entered by this Court and which checks must be dis-honored.

41.     The Debtor's Cash Management System, or a similar variation of it, has been employed for some time and constitutes an essential business practice.  It allows the Debtor to control and monitor corporate funds, to ensure cash availability and to reduce administrative expenses by facilitating the movement of funds. The forced closure and reopening of such accounts and systems would be very costly to the Debtor, significantly disruptive to their operations, and potentially damaging to their business relations with customers, vendors and employees.

D.     **Utilities Motion.**

42.     Any interruption of utility service would severely disrupt and diminish the Debtor's chance for a successful reorganization. Accordingly, the Debtor requests the Court enter an order (a) prohibiting the Utility Companies from altering or discontinuing utility services based upon the chapter 11 filing, and (b) establishing procedures as described in the Utilities Motion for determining requests for assurance of payment.

**Conclusion.**

43.     I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to its business and estate, and is in the best interest of the Debtor's creditors, estates, and other stakeholders.

44.     Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entirety, together with such further relief as the Court deems just and proper.

Dated:   9/28/2020

_____
ARTHUR SILLS
Managing Member
Traverse City Equity Investments, LLC d/b/a
SpaBath Company

9